ALAN L. ISAACMAN, Bar #42273
MICHAEL A. PAINTER, Bar #43600
STEVEN H. BLACKMAN, Bar #93538
ISAACMAN, KAUFMAN & PAINTER
8484 Wilshire Boulevard, Suite 850
Beverly Hills, California 90211
(323) 782-7700 - Telephone
(323) 782-7744 - Facsimile

Attorneys for Plaintiff and Counterdefendants,
LUSA LIGHTING INT'L., INC., et al

FILED-SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

JAN 3 1 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                         DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| LUSA LIGHTING INT'L., INC., a California corporation,<br><br>Plaintiff,<br><br>v s.<br><br>AMERICA ELEX, INC., et al<br>Defendants.<br><br>AND RELATED CROSS-ACTION | CASE NO. SACV07-674-DOC(MLGx)<br><br>[PROPOSED] FIRST AMENDED COMPLAINT FOR:<br><br>(1)   PATENT INFRINGEMENT;<br>(2)   BREACH OF EXCLUSIVE MANUFACTURING AGREE-MENT;<br>(3)   BREACH OF NON-DISCLO-SURE AGREEMENT;<br>(4)   FRAUD AND CONCEALMENT<br><br>JURY TRIAL DEMANDED |

Plaintiff LUSA LIGHTING INTL., INC. and for causes of action against

Defendants, and each of them, complain and allege as follows:

<u>JURISDICTION</u>

1.    This action arises under the patent laws of the United States, Title 35,

United States Code.  This Court has jurisdiction over this claim under Title 35,

United States Code and 28 U.S.C. Section 1338(a).  This Court has jurisdiction

over Plaintiff's other claims under 28 U.S.C. Section 1367.

MAP-LUSA-2180

## THE PARTIES

2.     Plaintiff Lusa Lighting Intl., Inc. ("Lusa") is and at all times mentioned herein was a corporation organized and existing under the laws of the State of California, with its principal place of business in the County of Los Angeles.

3.     Lusa is informed and believes and based thereon alleges that Defendant America Elex, Inc. ("AEI") is and at all times herein mentioned was a corporation organized and existing under the laws of the State of California and has its principal place of business in Santa Fe Springs, California.

4.     Lusa is informed and believes and based thereon alleges that Defendant Amex Lighting, Inc. ("Amex") is and at all times herein mentioned was a corporation organized and existing under the laws of the State of California and has its principal place of business in Santa Fe Springs, California.

5.     Lusa is informed and believes and based thereon alleges that Defendant Michael Chen ("Chen") is an individual residing in the County of Los Angeles, State of California.  Lusa is informed and believes and based thereon alleges that Chen is an Executive and Manager at AEI and Amex.

6.     Lusa is informed and believes, and based thereon alleges, that there exists, and at all times herein mentioned existed, a unity of interest and ownership between Defendants AEI and Chen such that any individuality and separateness between Defendants AEI and Chen have ceased, and Defendants AEI and Chen are the alter ego of one another.

7.     Lusa is informed and believes, and based thereon alleges, that there exists, and at all times herein mentioned existed, a unity of interest and ownership between Defendants Amex and Chen such that any individuality and separateness between Defendants Amex and Chen have ceased, and Defendants Amex and Chen are the alter ego of one another.

MAP-LUSA-2180

-2-

1    8.    Lusa is informed and believes, and based thereon alleges, that

2  adherence to the fiction or separate existence of AEI or Chen as an individual or

3  entity distinct from the other would permit an abuse of corporate privileges and

4  would sanction fraud or promote injustice.

5    9.    Lusa is informed and believes, and based thereon alleges, that

6  adherence to the fiction or separate existence of Amex or Chen as an individual or

7  entity distinct from the other would permit an abuse of corporate privileges and

8  would sanction fraud or promote injustice.

9    10.    The true names or capacities, whether individual, corporate,

10  associate, representative, or otherwise, of the defendants named herein as DOES I

11  - X, inclusive, are unknown to Lusa who therefore, pursuant to Local Rule 19-1 of

12  this Court, sues said defendants by such fictitious names and Lusa will amend this

13  Complaint to show their true names and capacities when the same have been

14  ascertained.

15                    GENERAL ALLEGATIONS

16    11.    Lusa is a designer and importer of lighting fixtures, including,

17  but not limited to, under-cabinet, and under-shelf lighting fixtures and related

18  products.

19    12.    Lusa is informed and believes and based thereon alleges that

20  AEI is engaged in the business of manufacturing. producing and selling lighting

21  products.

22    13.    Lusa is informed and believes and based thereon alleges that

23  Amex is engaged in the business of manufacturing. producing and selling lighting

24  products.

25    14.    On or around February 9, 1998, Lusa and Defendants entered

26  into an "Exclusive Manufacturing Agreement" ("EMA"). A true and correct copy

27  of the Exclusive Manufacturing Agreement is attached hereto as Exhibit 1.

28  Pursuant to the EMA, Defendants agreed to manufacture for and sell to Lusa

1   certain under-cabinet lighting products created by Lusa. Additionally, the EMA

2   also provided that Lusa could request that Defendants manufacture other lighting

3   products for Lusa, which Lusa did. With respect to the lighting products Defen-

4   dants agreed to manufacture for Lusa, Defendants agreed that during the term of

5   the EMA and for six months thereafter, Defendants would not produce the prod-

6   ucts manufactured for Lusa, or any modification, variation or similar types of

7   products, for any other person, party or entity. In the event that Defendants failed

8   to comply with their agreement to manufacture the products at issue exclusively

9   for Lusa, the parties agreed that Lusa would be entitled to damages as well as

10  injunctive relief.

11       15.   Simultaneously to entering into the EMA, Lusa and Defendants

12  entered into a Non-Disclosure Agreement ("NDA"). A true and correct copy of the

13  Non-Disclosure Agreement is attached hereto as Exhibit 2. Pursuant to the NDA,

14  Defendants agreed to (among other things): (1) maintain the confidentiality of

15  certain proprietary information provided by Lusa to Defendants; (2) refrain from

16  employing any proprietary information or material disclosed or information or

17  techniques learned through the disclosure from Lusa (in the absence of Lusa's

18  permission); (3) refrain from making copies of material supplied by Lusa, in the

19  absence of Lusa's permission; and (4) promptly return to Lusa any material

20  supplied as part of the disclosure upon request by Lusa.

21       16.   Lusa and AEI operated under both the EMA and NDA  for

22  several years. Pursuant to the EMA, Defendants agreed to manufacture several

23  lighting products for Lusa, including but not limited to a high voltage under-

24  cabinet lighting fixture.

25       17.   On December 10, 2002, United States Letters Patent No.

26  6,491,413 was duly and legally issued to Lusa for a high voltage under-cabinet

27  lighting fixture. Since that date Lusa has been and still is the owner of those

28

Letters Patent, a copy thereof being attached hereto as Exhibit 3 (hereinafter referred to as the "413 patent").

18. In or around 2005, it became evident that there were problems with an electronic transformer Defendants, AEI and Chen, had included within Lusa's product. When Lusa sought to have Defendants replace the defective transformers, Defendants refused to do so.

19. Lusa later discovered that, in violation of the EMA and Lusa's intellectual property rights, Defendants, AEI and Chen, had been manufacturing for themselves and selling and/or attempting to sell to third parties, lighting products (and/or variations, modifications or substantially similar products) which infringed Lusa's patents and/or that Defendants had agreed to manufacture exclusively for Lusa. Lusa also learned, that with respect to the lighting products which contained the defective transformers, Defendants had manufactured the same products for themselves, to sell to third parties, yet had included a different, more durable transformer than the transformer it had included within the product it manufactured for Lusa. Lusa also discovered that Defendants had obtained a patent in China for some of Lusa's lighting products, in Defendants' name, and had attempted to use the fraudulently obtained patent to interfere with a contract Lusa had with another manufacturer.

<u>FIRST CLAIM FOR RELIEF</u>

<u>(Infringement of U.S. Patent No. 6,491,413)</u>

(By Lusa Against All Defendants)

20. Lusa repeats and incorporates Paragraphs 1 - 198, inclusive, of this Complaint as though set forth in full herein again.

21. On December 10, 2002, United States Letters Patent No. 6,491,413 was duly and legally issued to Lusa for an invention in a high voltage under-cabinet lighting fixture, and since that date Lusa has been and still is the

1    owner of those Letters Patent, a copy thereof being attached hereto as Exhibit 3

2    (hereinafter referred to as the "'413 patent").

3         22.     Defendants, America Elex, Chen and Amex, have been and still

4    are infringing the '413 patent by making, selling, and using in the United States

5    high voltage, under-cabinet lighting fixtures embodying the invention of the '413

6    patent, and will continue to do so unless enjoined by this Court.

7         23.     Lusa has placed the required statutory notice on all under-

8    cabinet lighting fixtures manufactured and sold by Lusa under the '413 patent, and

9    has given written notice to Defendants of their infringement.

10         24.     The infringement of the '413 patent by Defendants, America

11    Elex, Chen and Amex, has caused and will cause Lusa irreparable harm for which

12    there is no adequate remedy at law.

13         25.     That Lusa is informed and believes and, based upon such

14    information and belief, alleges that Defendants, America Elex, Chen and Amex,

15    have earned profits for their infringing activities; that Lusa has suffered damages

16    as a result of the Defendants' acts, the amount of the profits earned by the Defen-

17    dants, America Elex, Chen and Amex, and the extent of the damages to Lusa by

18    reason of the infringement of the '413 patent by Defendants are presently unknown

19    to Lusa; that Lusa shall request leave to amend its Complaint when the precise

20    amount of damages is known.

21                  SECOND CLAIM FOR RELIEF

22                    (Breach of the EMA)

23            (By Lusa Against Defendants, AEI and Chen)

24         26.     Plaintiff refers to and incorporates herein by reference each and

25    every allegation contained in paragraphs 1 through 19 above, as though fully set

26    forth.

27         27.     On or around February 9, 1998, Lusa and Defendants entered

28    into the EMA. Pursuant to the EMA, Defendants were required to (among other

MAP-LUSA-2180

things) manufacture for and sell to Lusa certain products in accordance with Lusa's specifications. With respect to these products (and/or any variations, modification or similar types of products), Defendants agreed not to manufacture or sell them to any other person, party or entity during the term of the EMA and for six months thereafter. Defendants also agreed to return Lusa's tooling upon termination of the EMA.

28.    Except as excused by the conduct of Defendants, Lusa fulfilled each and every obligation it was legally required to perform under the EMA. Defendants breached their obligations under the EMA by, among other things, manufacturing and, upon information and belief, selling to third parties the products (and/or modifications, variations or similar types of products) they agreed to manufacture exclusively for Lusa, and failing to provide products which conformed to Lusa's specifications.

29.    As a proximate result of Defendants' breach of the EMA, Lusa has been damaged in an amount according to proof at the time of trial, including accrued interest and attorneys' fees and costs per the EMA.

30.    Additionally, Lusa is also entitled to temporary, preliminary and/or permanent injunctive relief. Pursuant to paragraph 14 of the EMA, in the event that Defendants breached paragraph 3 of the EMA, which required Defendants to refrain from manufacturing the products, or any similar products for any person, party or entity other than Lusa, Defendants agreed that damages would be impractical or too difficult to determine and that injunctive relief, temporary, preliminary or permanent was an agreed upon remedy in addition to provable damages. Defendants also agreed that with respect to injunctive relief, Lusa would not be required to post a bond.

### THIRD CLAIM FOR RELIEF

### (Breach of NDA)

### (By Lusa Against Defendants, AEI and Chen)

31.   Plaintiff refers to and incorporates herein by reference each and every allegation contained in paragraphs 1 through 198 above, as though fully set forth.

32.   On or around February 9, 1998, Lusa and Defendants entered into the NDA. Pursuant to the NDA, Defendants were required to (1) maintain the confidentiality of certain proprietary information provided by Lusa to Defendants; (2) refrain from employing any proprietary information or material disclosed or information or techniques learned through the disclosure from Lusa (in the absence of Lusa's permission); and (3) refrain from making copies of material supplied by Lusa, in the absence of Lusa's permission.

33.   Except as excused by the conduct of Defendants, Lusa fulfilled each and every obligation it was legally required to perform under the NDA.

34.   Lusa is informed and believes and based thereon alleges that Defendants breached their obligations under the NDA by, among other things, revealing confidential proprietary information to third parties without Lusa's consent and/or who were not authorized to receive such information, employing (without Lusa's permission) Lusa's proprietary information, material or techniques learned through the disclosure from Lusa, making copies of material supplied by Lusa without Lusa's consent.

35.   As a proximate result of Defendants' breach of the NDA, Lusa has been damaged in an amount according to proof at the time of trial, including accrued interest and attorneys' fees and costs per the NDA.

MAP-LUSA-2180

-8-

## FOURTH CLAIM FOR RELIEF

### (Fraud and Concealment)

### (By Lusa Against Defendants, AEi and Chen)

36.  Lusa refers to and incorporates herein by reference each and every allegation contained in paragraphs 1 through 19, as though fully set forth.

37.  In 1998, and on specific dates thereafter, Defendant Chen, Executive and Manager of AEI, represented to Plaintiff's President, Sanford Benensohn, both orally and in writing that with respect to the products Defendants manufactured for Lusa, Defendants would not manufacture or sell to any other person or entity the same products or any modification, variation, or similar type of products.  In addition, in or around late 2004 and thereafter, with respect to the products Defendants manufactured  for the Maxim agreement, Chen represented to Sanford Benensohn that the products were merchantable, fit for the use for which they would be put, and that the transformers included within the products had a two year warranty.  In late 2004, or early 2005, after the defective transformers were brought to Chen's attention, Chen represented that the number of defective transformers was small and that the defective transformers were no longer being used.  Chen also represented that Defendants would replace the defective trans-formers and pay for the costs of replacement.  Furthermore, in or around 2005 or 2006, Chen fraudulently obtained patents in China (which have subsequently been invalidated) for Lusa's products and attempted to use the fraudulently obtained patents to interfere with a manufacturing contract Lusa had with a third party.

38.  At the time Chen represented that Defendants would manufac-ture the products exclusively for Lusa, Chen knew that this representation was false as, upon information and belief, Chen was aware that Defendants intended to produce for their own benefit the same products (or modifications, variations or similar products) as those produced for Lusa.  In addition, Chen knew that the representations regarding the products manufactured for the Maxim agreement

MAP-LUSA-2180

1  were false in that, on information and belief, Defendants were manufacturing the

2  same (or a substantially similar) product for itself in which it was using a different

3  transformer than the one included within the product manufactured for Lusa, and

4  was intentionally and knowingly including a defective component part in Lusa's

5  product. Based on the foregoing, Chen also knew that Defendants had no inten-

6  tion of replacing the defective transformers in the product manufactured for Lusa.

7  As for the Chinese patents which Defendants obtained and attempted to use to

8  disrupt a contract Lusa had with another manufacturer, Defendants had possession

9  of Lusa's patents and were aware that Defendants had no right to assert ownership

10  in them.

11         39.   Lusa actually and justifiably relied, to its detriment, on Defen-

12  dants' representations and conduct as set forth above. Lusa was thus deceived by

13  Defendants' representations.

14         40.   Lusa has suffered damages as a proximate result of Defendants'

15  false representations to Lusa and third parties. Because of Defendants' represen-

16  tations to Lusa, Lusa entered into the EMA and NDA with Defendants and

17  provided Defendants with information about Lusa's products, as well as other

18  confidential and/or proprietary information which Defendants' have subsequently

19  misused. Lusa also lost its contract with Maxim, due to Defendants' actions of

20  intentionally and knowingly including a defective transformer within Lusa's

21  products. As a result of Defendant's misrepresentations to third parties, Lusa has

22  incurred further damage, including but not limited to, attorney's fees and other

23  costs associated with invalidating the fraudulently obtained patents in China.

24         41.   The fraudulent conduct of Defendants involved false represen-

25  tations made to Lusa and others with the intent to deprive Lusa of property and

26  legal rights and cause Lusa injury. Defendants' conduct was despicable conduct

27  that had subjected Lusa to cruel and unjust hardship in conscious disregard of

28  Lusa's rights; and Defendants' conduct was intended to cause Lusa's injury, was

MAP-LUSA-2180               -10-

1   willful and performed with conscious disregard of the rights of others. Due to the

2   foregoing conduct, Lusa is entitled to recover punitive damages for the purpose of

3   making an example and punishing Defendants for their improper conduct.

4   <u>Prayer for Relief</u>

5   WHEREFORE, Lusa prays for judgment as follows:

6   That judgment be entered for Lusa and against Defendants as

7   appropriate on each claim for relief.

8   <u>For The First Claim For Relief</u>:

9   1.   That Defendants, America Elex, Chen and Amex, their agents,

10   servants, employees, assigns, attorneys, representatives, successors in business,

11   confederates and those persons in active concert or participation with them be

12   enjoined during the pendency of this action and permanently from making, using

13   or selling any goods which infringe United States Letters Patent No. 6,491,413;

14   2.   Award damages requiring Defendants to account to and pay to

15   Lusa all damages caused by reason of Defendants' infringement of United States

16   Letters Patent No. 6,491,413, pursuant to 35 U.S.C. §284, including enhanced

17   damages under 35 U.S.C. §284.

18   3.   Enter judgment pursuant to 35 U.S.C. §285 making this case

19   exceptional and awarding Lusa its attorneys' fees, costs and expenses.

20   <u>For The Second Claim For Relief</u>:

21   1.   That Defendants, their agents, servants, employees, assigns,

22   attorneys, representatives, successors in business, confederates and those persons

23   in active concert or participation with them be enjoined during the pendency of

24   this action and permanently from making, using or selling any goods in violation

25   of the terms of the EMA, including but not limited to, the exclusive manufacturing

26   provision of the EMA.

27

28

MAP-LUSA-2180                                    -11-

2.    Award damages requiring Defendants to account to and pay to Lusa all damages caused by reason of Defendants' violation of the terms of the EMA, including but not limited to the exclusive manufacturing provision of the EMA, including either Defendants' total profits or other compensation.

3.    For attorneys' fees and costs.

For The Fourth Claim For Relief:

1.    For damages in an amount according to proof at the time of trial, but in excess of this Court's minimum jurisdictional amount;

2.    For attorneys' fees and costs.

For The Fifth Claim For Relief:

1.    For damages in an amount to be proven at trial, according to proof;

2.    For special damages according to proof;

3.    For punitive and exemplary damages in a sum according to proof.

ON ALL CAUSES OF ACTION:

1.    For costs of suit incurred herein and interest at the legal rate

2.    For such other and further relief as this court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL OF THIS MATTER.**

Respectfully submitted,

ISAACMAN, KAUFMAN & PAINTER, P.C.

By: _____
Michael A. Painter
Attorneys for Plaintiff,
LUSA LIGHTING, INC.

Dated:  January 22, 2008

MAP-LUSA-2180

-12-

# EXHIBIT 1

## EXCLUSIVE MANUFACTURING AGREEMENT

THIS EXCLUSIVE MANUFACTURING AGREEMENT is made and entered into this __9__ day of __FEBRUARY__, 1998 by and between AMERICA ELEX ("AMERICA") and LUSA LIGHTING INT'L, INC., ("LUSA")

## WITNESSETH:

This Agreement is made with reference to the following facts:

A.    LUSA desires to have AMERICA manufacture and sell to LUSA certain under cabinet lighting products as listed on Exhibit "A" (attached hereto and by this reference made a part hereof) or which hereafter may be created by and sold by LUSA (all of the foregoing collectively referred to as "the products") on the terms and conditions set forth in this Agreement.

B.    AMERICA is engaged in the business of manufacturing and producing lighting products.

C.    Where it is the desire of LUSA and AMERICA to set forth the terms and conditions upon which AMERICA will exclusively manufacture and sell the products to LUSA.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants herein contained, the parties hereto hereby agree as follows:

Exhibit " __/__ " - Page __/__

1.    AMERICA hereby agrees to manufacture for and sell exclusively to LUSA all of LUSA's requirements for the products.

2.    The terms and conditions for the sale of the products are purchase order with sixty (60) day lead time, cost/freight: Hong Kong.  Payment: International Irrevocable Letter of Credit, payable at sight (the "terms and conditions"). AMERICA agrees that AMERICA will not change the terms and conditions during the term hereof except upon 90 days written notice and any orders existing or placed during that 90 day period shall be subject to the terms and conditions existing prior to the date of said notice.  Lusa shall have the right to accept or reject said change of terms and conditions.

3.    AMERICA covenants, warrants, represents and agrees that AMERICA will not produce the products, or any variations, modifications, or similar type products for any other person, party, or entity during the term hereof and for a period of six months after the termination or expiration of the term hereof.

4.    With respect to any new products which LUSA may desire to have AMERICA manufacture for it, LUSA shall present to AMERICA samples and/or drawings, and/or designs and other detailed data and information relating thereto.  AMERICA shall promptly advise LUSA of the terms and conditions of such manufacture and sale to LUSA.  LUSA shall have sixty days after receipt of such notice to determine if LUSA wishes to have AMERICA manufacture said product(s) on said terms and conditions. In the event that LUSA elects to have AMERICA manufacture said

F:\AGMTS\LUSA\MFG-AMD.ELX
012298

2

Exhibit " / " - Page 2

product(s), then and in such event AMERICA shall proceed to
manufacture said product(s) in accordance with the terms and
conditions hereof, subject however, to the prices agreed upon
with respect to said specific product. In the event that AMERICA
declines to manufacture said product(s) or in the event that LUSA
does not agree to the price, terms and conditions therefor,
AMERICA shall immediately return all the data, information,
drawings and designs of the subject product(s) to LUSA and LUSA
shall be free to seek alternative manufacturing sources therefor.
In connection with LUSA's initial submission of said new
product(s) to AMERICA, AMERICA agrees to execute a
confidentiality agreement in the form attached hereto, marked
Exhibit "B" and by this reference made a part hereof.

     5.    The initial term of this Agreement shall be for an
initial term of 10 years commencing as of the date of execution
hereof. This agreement shall automatically renew for successive
one-year periods after the initial term unless either party, by
written notice to the other, in writing by at lease sixty days
prior to the expiration of the then current term, then gives
notice to such party of its intent not to renew the term of this
agreement.

     6.    AMERICA further covenants, warrants, represents and
agrees that AMERICA shall fill all of LUSA's requirements for the
products and shall manufacture and ship the products in
accordance with LUSA's requirements. AMERICA covenants,
warrants, represents and agrees that AMERICA shall not reduce its

F:\AGMTS\LUSA\MFG-AMG.BLK
012298                3

production capacity unless or until it shall have given LUSA
ninety days prior written notice.  In the event that AMERICA
fails, neglects or refuses to fulfill LUSA's requirements,
subject to the provisions of Paragraph 7 hereof, LUSA shall have
the right to seek alternative manufacturing sources.

7.    Each party's performance hereunder is subject to
acts of God, strikes, lockouts, civil disorder, governmental
intervention or other matters outside of the control of the
parties hereto provided, however, such performances shall be
excused solely for the period of such intervention.

8.    LUSA may terminate this agreement if AMERICA does
not comply with LUSA's purchase order provisions.  In connection
with the foregoing, LUSA shall notify AMERICA in writing of such
default and AMERICA shall have thirty days after such notice is
sent to remedy such default.  Should AMERICA not remedy such
default within said thirty day period, then LUSA shall have the
right to terminate this Agreement.  In the event LUSA terminates
this Agreement, all tooling shall immediately be returned to LUSA
or forwarded to any party who LUSA directs AMERICA to transfer
the tooling to.

9.    In the event of legal action to enforce or
interpret the terms or provisions hereof, it is agreed that the
prevailing party in such litigation shall be entitled to recover
reasonable attorneys fees and court costs incurred in connection
herewith.

F:\AGMTS\LUSA\MFG-AMD.XLX
012298                                    4

Exhibit " 1 " - Page 4

10. Any notices required or permitted hereunder shall be given to the parties by being addressed to the parties as below-listed, postage prepaid, return receipt requested or by FAX with evidence of transmission and receipt as follows:

TO LUSA

Lusa Lighting Intl., Inc.
26235 Technology Drive
Suite 201
Valencia, CA 91355

TO AMERICA ELEX

America Elex
8511 Wellsford Place, #A
Santa Fe Springs, CA  90670

WITH COPY TO

Rubin M. Turner, Esq.
8383 Wilshire Boulevard
Suite 510
Beverly Hills, CA  90211

11. This Agreement contains the entire understanding between the parties and there are no oral understandings or agreements between the parties unless expressly referred to herein.

12. The parties agree that venue and jurisdiction for any action hereunder shall be solely and exclusively with a court of competent jurisdiction located in Los Angeles County, State of California, and the laws of the State of California shall apply to the  implementation, interpretation or operation of this Agreement.

P:\AGMTS\LUSA\MFG-AMO.ELX
012298

5

Exhibit " 1 " - Page 5

13.  The terms and provisions of this Agreement are personal to AMERICA and may not be assigned, transferred, delegated, or conveyed to any other person, party or entity. Additionally, in the event of any change of control of AMERICA by way of transfer of assets or sale of stock then, and in such event, LUSA, at its election, shall have the right to terminate this Agreement.

14.  In the event of a breach of Paragraph 3 hereof relating to AMERICA's agreement not to manufacture the products, or any similar products, for any other person, party or entity, AMERICA acknowledges and agrees that damages would be impractical or difficult to determine, and that injunctive relief, temporary, preliminary, and/or permanent, is agreeable as a remedy in addition to provable damages to LUSA, and that LUSA shall have the right to obtain such injunctive relief without posting of any bond.

IN WITNESS WHEREOF, the undersigned have executed this Exclusive Manufacturing Agreement the day and year first above mentioned.

LUSA LIGHTING INTL., INC.,
a California Corporation

By: _____
    SANFORD BENENSOHN

AMERICA ELEX

By: _____
    MICHAEL CHEN

Exhibit " 1 " - Page 6

P:\AGMTS\LUSA\MFG-AMG.ELX
012298

6

FROM : LUSA LIGHTING INTL,       PHONE NO. : 805 254 9285       Feb. 09 1998 12:05PM P18

13.  The terms and provisions of this Agreement are personal to AMERICA and may not be assigned, transferred, delegated, or conveyed to any other person, party or entity. Additionally, in the event of any change of control of AMERICA by way of transfer of assets or sale of stock then, and in such event, LUSA, at its election, shall have the right to terminate this Agreement.

14.  In the event of a breach of Paragraph 3 hereof relating to AMERICA's agreement not to manufacture the products, or any similar products, for any other person, party or entity, AMERICA acknowledges and agrees that damages would be impractical or difficult to determine, and that injunctive relief, temporary, preliminary, and/or permanent, is agreeable as a remedy in addition to provable damages to LUSA, and that LUSA shall have the right to obtain such injunctive relief without posting of any bond.

IN WITNESS WHEREOF, the undersigned have executed this Exclusive Manufacturing Agreement the day and year first above mentioned.

LUSA LIGHTING INTL., INC.,
a California Corporation

By: _____
SANFORD BERKENHORN

AMERICA ILEX

By: _____
MICHAEL CHEN

Exhibit " 1 " - Page 7

19

EXHIBIT 2

## NON-DISCLOSURE AGREEMENT

THIS AGREEMENT is entered into between LUSA LIGHTING INTL., INC. ("Proprietor") and AMERICA ELEX ("Disclosee") on this _9_ th day of February , 1998.

1.    Proprietor has developed certain techniques and material described below which are valuable and confidential intellectual property of Proprietor. The material which is subject to this Agreement is described as: __a halogen undercabinet line TRADEMARK: COMBILIGHT, MICRO-MAX, LIGHT SHELF, MICRO-STYX

and is hereafter referred to as the "Confidential Information."

2.    Proprietor and Disclosee wish to enter into discussions and negotiations and therefore the Confidential Information will be disclosed in detail by Proprietor to Disclosee. It is acknowledged by Disclosee that the information being supplied by Proprietor represents valuable intellectual property rights of Proprietor including, but not limited to, trade secrets, copyrights and patents. The information and material whether written or oral being supplied to Disclosee is confidential in nature and this Agreement forms a confidential relationship.

3.    Therefore, Disclosee agrees to keep confidential any information or material it may acquire through the disclosure being made by Proprietor whether that disclosure is in writing or oral. Disclosee agrees to take appropriate steps to protect against disclosure of any material or information of Proprietor to third parties as well as against disclosure to its own employees who do

Exhibit "__" - Page __

not have a need to know the material disclosed by Proprietor. Disclosee further agrees to not employ any material disclosed or information or techniques learned through such disclosure except by specific permission of Proprietor through appropriate licensing agreements. Disclosee agrees to not make copies of materials supplied by Proprietor which are part of this subject matter, except by specific permission of Proprietor.

4.  Disclosee acknowledges that should Proprietor supply copies of any subject matter materials to Disclosee, Proprietor does not thereby waive any of its valuable intellectual property rights to keep such subject matter proprietary and confidential, except as specifically defined in any subsequent licensing agreement which may be entered into between the parties. Disclosee agrees to promptly return to Proprietor any material supplied as part of this disclosure upon request of Proprietor.

5.  The parties hereto agree that the consideration for this Agreement shall be the opening of opportunities for future beneficial relations which may result from this disclosure.

6.  In the event of legal action to enforce or interpret the terms and provisions hereof, it is agreed that the prevailing party in such litigation shall be entitled to recover attorneys' fees and court costs incurred in connection therewith. The parties further agree that venue and jurisdiction for any suit hereunder shall be solely and exclusively with a court of competent jurisdiction located in Los Angeles County, State of California.

2

Exhibit " 1 " - Page 2

05/25/2006 15:18   Case 8:07-cv-00674-DOC-MLG   Document 42-2   LUSA LIGHTING   Filed 01/29/2008   Page 24 of 36   PAGE 11/20
FROM : LUSA LIGHTING INT'L INC.   PHONE NO. : 805 294 9255   Feb. 09 1998 11:59AM P4

7.   The terms and provisions hereof inure to the benefit of and bind the respective parties hereto, as well as their respective parent, subsidiary, affiliated and related entities and their respective officers, directors, shareholders, employees, representatives and consultants.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first set forth above.

LUSA LIGHTING INT'L., INC.

BY: _____
HARFORD BENENSOHN, President

"Proprietor"

AMERICA FLEX

BY: _____
MICHAEL SHEN

"Disclosee"

3

MAY 25 2006 15:36   6612949265   22

# EXHIBIT 3

(12) **United States Patent**

Benesohn

(10) Patent No.: **US 6,491,413 B1**

(45) Date of Patent: **Dec. 10, 2002**

(54) **HIGH VOLTAGE (LINE) UNDER-CABINET LIGHTING FIXTURE**

(75) Inventor: **Sandford H. Benesohn**, Beverly Hills, CA (US)

(73) Assignee: **LUSA Lighting International**, Valencia, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/628,749**

(22) Filed: **Jul. 31, 2000**

(51) Int. Cl.[7] ................................................. F21V 29/00

(52) U.S. Cl. ........................ 362/294; 362/373; 362/364; 362/345

(58) Field of Search ................................. 362/133, 147, 362/294, 345, 364, 365, 373, 374, 375, 404

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,097,400 A | * 3/1992 | Cvek | 362/345 |
| 5,394,316 A | * 2/1995 | Holbrook et al. | 362/294 |
| 5,400,231 A | * 3/1995 | Huang | 362/294 |
| 5,909,955 A | 6/1999 | Roorda | 362/368 |

OTHER PUBLICATIONS

Evolution Minilites Collection brochure, 1900 N. Andrews Ave, Ext., Suite C, Pompano Beach FL 33069 (undated). Outwater Hardware Catalog pp. 154,155; Outwater Hardware Corporation, 11 West End Road, Totowa, NJ 07512 (1998).

Laura & Honnelore Co., Ltd flyer in GES Lightning Review Catalog, Oct. 1998.

Home Lightning and Accessories, Disc Light, Apr. 1996, p. 133.

Lightning Concepts, Outwater Plastic Industries, Inc., 4 Passaic Street, PO Drawer 403, Wood–Ridge, NJ 07075 (undated).

* cited by examiner

*Primary Examiner*—Y. My Quach-Lee
(74) *Attorney, Agent, or Firm*—Baker, Donelson, Bearman & Caldwell

(57) **ABSTRACT**

A high voltage under-cabinet lighting fixture having a housing suitable for recess mounting engageable to a can for surface mounting, which housing as an open end opposing a base having at least a thickened portion and a plurality of slotted openings therein. A reflector having a dished cavity seats on projections extending from the open end of the housing to define a gap between the reflector and the housing. A lamp socket is received in the housing to dispose a lamp substantially in alignment with the thickened portion of the base. An insulated pad is disposed between the reflector and the thickened portion of the base. A cap defining a plurality of space-apart ports includes a transparent sheet for communicating light from the light fixture. The cap is received on the housing which thereby defines a pathway for communicating air through the ports, the gap, and the openings to flow about and past the reflector for communicating heat from the reflector to ambient air past the surface to which the housing mounts.

**22 Claims, 3 Drawing Sheets**



Exhibit " _2_ " - Page _1_

**U.S. Patent**          Dec. 10, 2002          **Sheet 1 of 3**          US 6,491,413 B1

# Fig. 1



**U.S. Patent**          Dec. 10, 2002          **Sheet 2 of 3**          **US 6,491,413 B1**



Fig. 2                    Fig. 6



Fig. 3                    Fig. 4

Exhibit " 3 " - Page  3

25

**U.S. Patent**          Dec. 10, 2002          **Sheet 3 of 3**          US 6,491,413 B1

# Fig. 5



US 6,491,413 B1

1

# HIGH VOLTAGE (LINE) UNDER-CABINET LIGHTING FIXTURE

## TECHNICAL FIELD

The present invention relates to under-cabinet lighting fixtures. More particularly, the present invention relates to high voltage under-cabinet lighting fixtures which are readily installed to provide bright lighting with controlled and limited transfer of heat to mounting surfaces.

## BACKGROUND OF THE INVENTION

Lights and lighting not only provide useful general illumination of interior and exterior spaces in homes and buildings, but also provide ornamental and artistic treatments for decorative purposes. These purposes include lighting functions as well as highlights for artwork, for accent and interior ornamental design functions, and other functions. Often furniture or cabinetry have lights for illuminating articles held within the furniture or cabinets. For cabinets, and in particular kitchen wall cabinets, lighting fixtures are often mounted to a lower exterior surface or recessed therein, for providing lighting to countertop surfaces below the cabinets. In a "recess" application, a cavity within a shelf receives the light fixture. The lighting fixture thereby has a reduced profile outwardly of the mounting surface.

One type of lighting fixture is known as an under-cabinet puck light. These lights are generally cylindrical disc-shaped housings. The housings contain a reflector, a lamp socket with a light emitive bulb, and a glass lens for transmitting light from the housing to the countertop surface below the cabinet. The socket connects to a supply of electrical current.

Under-cabinet puck lights originated in the European lighting market a number of years ago by primarily German and Italian manufacturers. These under-cabinet puck lights included transformer devices to provide 12 volt direct current for illuminating the light bulbs. The transformer connects to line voltage, which in Europe is 220 volt alternating current, to provide the electrical current for operating the lights at the stepped-down voltage. Generally, a plurality of the under-cabinet puck lights connect by electrical wires to the transformer. These lighting systems were known as low voltage systems, due to operation with the stepped-down direct current of 12 volts from the transformer.

Such low voltage direct current lighting systems provide a number of advantages. The light housings and transformers are installed by connecting the transformer directly to the line current and then using wiring to connect the lights to the transformer. Because the current was low voltage, the connections of the wiring do not require special electrical junction boxes. Also, special conduit is generally not required for the wiring, and the wiring may be exposed, although preferably the wiring is placed at side edges of the shelf or other support surface to which the lighting fixture was attached. Further, the low voltage lights generate little heat. Accordingly, these low voltage under-cabinet puck lights are appropriate for use mounted to wooden surfaces under kitchen cabinetry or recessed into shelf portions of cabinets. The lights provide several pools of lights to the countertop surface, and are used typically in kitchens and display cabinetry for providing light on the working surfaces in kitchens as well as for use in highlighting articles in display cabinets.

While the under-cabinet puck lights provide light to work areas, the brightness of the illuminative effect has not been

2

entirely satisfactory. In response, Lusa Lighting of Los Angeles, Calif., developed a low-voltage puck lighting system using halogen bulbs. Halogen bulbs provide a significantly higher light output per watt as compared to conventional incandescent bulbs. Low voltage under-cabinet halogen light systems use the low voltage components discussed above. These systems have a maximum of approximately 20 watts per lighting fixture installed in surface mount or recessed mount applications.

The low voltage halogen lights are generally powered by electronic transformers which function on the low side at 12 volts direct current output and on the high side with 120 volts alternating current input, for use in the United States. Use of transformers however is not entirely satisfactory. Transformers are subject radio frequency interference which may cause lights to flicker or dim. Transformers are generally bulky and require special mounting. The total combined wattage of the lamps operated by the transformer cannot exceed the output of the transformer. Also, many electronic transformers do not deliver the full rated wattage to the lamps. As the distance increases between the lamp and the transformer, the lumen output decreases. In response, lighting systems that use high voltage, 120 volt alternating current has been developed. Generally 120 volt systems do not limit the number of lamps used in an application. Lumen output from the lamps remains constant, independent of the length of the electrical cord. Lamps operated on an 120 volt system receive full wattage capacity. Single lights are readily installed with standard plug and switches and do not require separately provided transformer. These systems however require steel housings to accommodate the increased heat emitted by the lamps operating at high-current, line voltage. These lighting fixtures require surface mounting, and are not designed to be incorporated into recess-mounted applications. The high voltage systems therefore eliminated the transformer requirement for under-cabinet lighting, but the heat generated by the lamps at line voltage limited the applications for use. Further, high voltage light bulbs typically had threaded bases for engaging screw sockets. These sockets are bulky in size and generally impractical for the smaller under-cabinet puck type fixture. Small bulbs using line voltage also had relatively limited life, and typically required replacement more frequently than do the low voltage bulbs.

Accordingly, there is a need in the art for an under-cabinet lighting fixture for surface and recessed mounting and operating on high line voltage for increased illumination with controlled transfer of the heat communicated therefrom. It is to such that the present invention is directed.

## BRIEF SUMMARY OF THE PRESENT INVENTION

The present invention provides an under-cabinet lighting fixture for surface and recessed mounting and operating on high line voltage for increased illumination with controlled transfer of the heat communicated therefrom, with a housing that defines an open end opposing a base having a thickened portion. The housing defines a plurality of openings in the base, and a plurality of projections extending from an edge of the housing. A reflector defining a dished cavity seats on the projections to define a gap between the reflector and the housing. A lamp socket received in the housing engages a lamp bulb that is substantially in alignment with the thickened portion of the base and disposed in the dished cavity. A cap received on the housing has a plurality of spaced-apart ports. The high voltage lighting fixture defines a pathway for communicating air through the ports, the gap, and the

US 6,491,413 B1

3

openings, past the reflector for communicating heat from the reflector to ambient air.

Objects, advantages, and features of the invention will be come apparent upon a reading of the following detailed description of the present invention in conjunction with the drawings and the appended claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an exploded perspective view of a lighting fixture according to the present invention.

FIG. 2 is a perspective bottom view of the housing for the light fixture shown in FIG. 1.

FIG. 3 is a perspective view of a surface-mounting installation of the lighting fixture shown in FIG. 1.

FIG. 4 is a perspective view of a recessed-mounting installation of the lighting fixture shown in FIG. 1.

FIG. 5 is an exploded perspective view of an alternate embodiment of a lighting fixture according to the present invention.

FIG. 6 is a perspective bottom view of the housing for the light fixture shown in FIG. 5.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring now in more detail to the drawings in which like parts have like identifiers, FIG. 1 illustrates in exploded perspective view a high voltage light fixture 10 according to the present invention. The light fixture 10 in the illustrated embodiment is adapted for mounting as an under-cabinet lighting fixture or for recessed mounting in a cabinet, as discussed below. The light fixture 10 comprises a housing 12 having an open end 14 with a flange 16 extending laterally therefrom. Three posts 18 extend from a first surface of the flange 16. A pair of opposing tabs 20 are defined in the side wall of the housing 12. The tabs 20 are engaged at a first end to the housing 12 for flexible movement relative to the housing, for a purpose discussed below. The tabs 20 include an outwardly extending tip 23.

The housing 12 defines a partially closed bottom 22 having a plurality of openings 24. In the illustrated embodiment, the openings 24 are aligned slots defining concentric rings arranged radially. A central portion 26 defines a thickened portion of the bottom 22, as best illustrated in FIG. 2 In a preferred embodiment, the thickened portion 26 extends 0.06 inches from the surface of the bottom 22, to approximately double the thickness of the wall of the housing 12 in the central portion 26. A slot 28 is defined in the side wall of the housing adjacent the bottom 22 for receiving a pair of electric wires 29. A pair of lugs 31 extend upwardly from opposing sides of the slot 28. A pair of posts 30 extend from opposing sides of the slot 28. A pair of posts 30 extend from the open end 14 to the bottom 22 on opposing sides of the housing 12. The posts 30 each define a bore 32 extending along a longitudinal axis of the post. Studs 34 extend from the bottom 22 and are spaced-apart from each of the respective posts 30.

A pair of tabs 36 extend upwardly from the bottom 22. Each tab 36 defines an angled hook 40 at a distal end 38. A plate 42 extends upwardly from the bottom 22. The plate 42 is disposed radially inwardly from the side wall of the housing and between the tabs 36. The tabs 38, the plate 42, and a portion of the housing 12 cooperatively define a recess 44 for receiving a lamp socket 46. The lamp socket 46 defines side openings 47 for receiving the ends of the electrical wires and lamp post sockets or openings 48 for

4

engaging a lamp 50. The socket 46 is specially configured to permit using bulbs for 120 volt applications, but not bulbs for low voltage application. The light bulb 50 is a halogen 120 volt type T-4 glass shaped bulb with a type G-8 lamp base, and is rated to provide over 1,000 hours.

The present invention accordingly provides a halogen T-4 shaped bulb of about 20 watts with a limiting G-8 lamp base for 120 volt applications. In this way, low volt bulbs of a T-4 type are excluded from use in the fixture 10 of the present invention. A U-shaped brace 49 defines a pair of opposing holes at distal ends. The brace 49 is received by the lugs 31 with screws entering the lugs 31 through the holes for securing the electrical wires 29 in the slot 28.

The lighting fixture 10 includes a reflector 60. The reflector 60 preferably is a stamped aluminum member defining a dish-shaped cavity 61 with a laterally extending flange 64. The reflector 60 seats on the three posts 18 on the upper surface of the flange 16. This defines air flow pathways therebetween. In the illustrated embodiment, the face of the dish-shaped cavity 61 defines a plurality of facets 63 for reflecting light. A pad 65 of an insulative material is disposed between the thickened portion 26 and the reflector 60. An opening 66 is defined in a side of the reflector 60. The opening 66 is configured for receiving therethrough a portion of the lamp socket 46. The flange 64 defines a plurality of openings 68 at an edge of the cavity 61. In the illustrated embodiment, the openings are elongate slots. The flange 64 defines a pair of opposing flats 70 each with an adjacent opening 72. Also, in the illustrated embodiment, three other openings 74 are defined in the flange 64. The openings 74 are spaced-apart uniformly on a perimeter edge portion of the flange 64.

A cap 80 closes the housing 12. The cap 80 defines a central opening 82. A plurality of fingers 84 extend from an inner surface of a cap adjacent the central opening. The fingers 84 preferably angle towards the opening 82. The fingers 84 cooperatively engage a glass lens 86. In the illustrated embodiment, the glass lens is a UV filter for reducing emissions from halogen light bulbs preferably used with the lighting apparatus 10. A plurality slot-like of openings 88 are defined in the cap 80. A pair of ears 90 extend radially inwardly from a skirt of the cap 80 on opposing sides.

The lighting fixture described above is particularly useful for recessed mounting in cabinets, as discussed below. Also illustrated in FIG. 1 is a surface can 100 for surface mounting of the fixture 10. The can 100 defines an annular ring 102 having an inwardly extending flange 104. A pair of opposing notches 106 are defined in the flange 104. Further, the three arcuate slots 108 are defined in the flange 104. The slots 108 align with the openings 74 in the reflector 60 for a purpose discussed below. Off-set from the notches 106 are two pairs of opposing side flanges 110, 112. A pair of opposing shoes 114 extend radially towards each other from a lower edge of the side wall of the ring 102. Each shoe 114 defines an opening 116. A plurality of pins 118 extend from the ring 102 opposing the flange 104. The shoe 114 and the pins 118 space the can 100 from a surface to which the can 100 mounts and defines airflow pathways between the light fixture 10 and the surface. An alternate embodiment does not include the pins 118, but defines a plurality of spaced-apart holes in the side wall 107 for airflow out of the can 100.

FIG. 5 is an exploded perspective view of a lighting fixture 10a according to the present invention, and FIG. 6 is a perspective bottom view of a housing 12a for the light fixture 10a. In this embodiment, a plurality of legs 27 extend

US 6,491,413 B1

**5**

outwardly from the bottom 22. The surface can 100a does not include the pins 118. Rather, the legs 27 extending from the housing 12a space the light fixture 10a from a surface to which the can 100a mounts. The legs 27 accordingly defines airflow pathways between the light fixture 10a and the surface.

FIG. 3 is a perspective view of a surface-mounting installation of the light fixture 10. In this mounting, the housing 12 is received within the can 100 and mounted with screws extending through the holes 116 in the shoes 114 to the surface 120. FIG. 4 is a perspective view of a recessed mounting installation of the recessed lighting fixture 10. In this installation, the surface can 100 is not used. Rather, the housing 12 is secured within a recess 122 in the mounting surface 120 with screws extending through the openings 74 and the aligned posts 18 in the flange 16. In both installations, the cap 80 closes the housing 12.

For use, the electric wires 29 pass through the slot 28 in the housing 12 and separate. The separate wires loop through the respective studs 34 adjacent the posts 30 on opposing sides of the housing 12. The distal ends of the electric wires 29 are electrically connected to the socket 46 through the opposing holes 47. The socket 46 is secured in the recess 44 by the tabs 36. The brace 49 is secured by screws to the lugs 31 in order to hold the electric wires 29 in the slot 28.

In the preferred embodiment, the insulative pad 65 is placed on the thickened central portion 26. The reflector 60 is inserted into the housing 12 and seats on the pad 65. A bulb, preferably a halogen bulb, is engaged to the lamp post openings 48 in the socket 46.

As illustrated in FIG. 4, the housing 12 may be installed in the annular recess 122 of the shelf 120. An appropriate sized hole is created in the selected location. The electrical wires 29 are passed through the hole. The light housing 12 is pushed into the recess. The flange 64 overlaps a portion of the shelf 120. Three screws extend through the openings 74 to secure the housing 12 in place. The cap 80 is attached to the distal end of the housing 12. This is accomplished by pushing the ears 90 past the opposing flats 70. Rotation of the cap 80 brings the ears 90 under the flange 64 to secure the cap to the flange. The free end of the electric wires 29 is connected to a source of line voltage. Preferably, the electric wires 29 connect through a switch for selectively actuating the lamp.

The lighting fixture 10 of the present invention also surface mounts as illustrated in FIG. 3 with the housing 12 received within the open end of the can 100. This is accomplished by locating a selected position for the fixture 10 on the surface 120. The electrical wires 29 in the illustrated embodiment extend through an opening in the mounting surface 120. The can 100 attaches to the surface with screws extending through the openings 116 in the opposing shoes 114. The subassembly of the housing 12 and the reflector 60 are then engaged to the surface can 100. The tabs 20 align with the flanges 110, 112. The housing 12 is pushed into the can. The tabs 20 flex and allow the housing past the flange 104. The flanges 110 and 112 receive the tabs 20 therebetween to prevent rotation of the housing 12. The free end of the electrical wires 29 are connected to a source of line voltage for powering the light fixture 10. The slots 108 in the flange 104 align with the openings 74 in the reflector 60 and the openings of the posts 18 in the housing 12. Screws through the openings and the slots secure the housing to the surface 120. The pins 118 extending from the ring 102 define airflow pathways between the light fixture 10

**6**

and the surface 120 to which the can 100 is mounted. The airflow pathway provides a thermal pathway for communicating heat from the lighting fixture 10. The cap 80 is attached as discussed above.

In the embodiment illustrated in FIGS. 5 and 6, the legs 27 extending from the bottom 22 space the light fixture 10a from the surface 120 to which the can 100a is mounted. This defines airflow pathways between the light fixture 10a and the surface 120. The airflow pathways provide thermal pathways for communicating heat from the lighting fixture 10a. The cap 80 is attached as discussed above.

In operation, the lighting fixture 10 defines thermal pathways through the cap 80, the reflector 60, and the housing 12, for communicating heat from the lighting fixture to ambient air. These pathways provide an air pathway chimney effect for transferring heat from the fixture 10 to ambient air. Air enters the lighting fixture 10 through the slot-like openings 88 in the cap 80. The air travels through the openings 68 in the reflector 60 as well as passing through the gap defined between the reflector 60 and the housing 12 by the posts 18. With the light bulb illuminated, the air becomes heated as it travels past the reflector 60. The heated air exits the housing 12 through the openings 24 in the bottom 22. For recess mounting, the heat communicates into the space above the mounting surface 120. For surface mounting, the heat communicates outwardly of the housing along the surface 120 through the gaps or pathways defined by depending members which in the illustrated embodiment are the pins 118 (or in the alternate embodiment, by the legs 27). In an alternate embodiment, the heated air communicates through holes in the side walls of the housing 12 and the can 100. In this manner, the high-voltage lighting fixture 10 of the present invention provides controlled transfer of the heat communicated by the lamp in the under-cabinet lighting fixture 10.

. A lighting fixture according to the present invention was subjected to temperature testing pursuant to UNDERWRITERS LABORATORY Test 153, section 101 11th edition. In this test, temperature readings were obtained by thermocouples consisting of wires not larger than No. 24 AWG ($0.21 \text{ mm}^2$). The thermocoupled junction and adjacent thermocouple lead wire were held securely in thermal contact with the surface of the material for which the temperature was being measured, as listed below in Table 2. The thermocouples were placed at locations of the hottest accessible parts. The thermocouples were secured to surfaces by welding, soldering, fullers earth, and sodium silicate (waterglass), adhesive suitable for surface and temperatures, or equivalent, so that good thermal contact was maintained. Tape was not used to secure the thermocouple within 3 inches (76.2 cm) of the thermocouple junction.

For units using polymeric parts such as a thermal plastic enclosure, temperatures were measured by placing one or more thermocouples in contact with a part in such a manner that a thermocouple was wedged between the part and any metallic material or other source of conducted heat. For a source of radiated or convected heat, thermocouples were inserted from outside surfaces through holes drilled in the polymeric material, such that the thermocouple tips were placed near the plane of the inside surface and sealed in place with fuller's earth and sodium silicate (waterglass).

The ambient temperature was measured by means of a thermocouple immersed in a bath of 15 ml of mineral oil in a glass container. The oil bath was placed at the same level as the horizontal plane formed by a line that passed through the fixture half-way down its vertical length and at least 3



## US 6,491,413 B1

**7**

fixture diameters from the fixture horizontally. The test was conducted in ambient temperature of 25±5° C. (77±9° F.).

In the test, a portable lamp was operated continuously at rated lamp wattage until consistent temperatures were obtained. A temperature was considered consistent if the test was running at least three hours and three successive readings taken at 30-minute intervals were within 1° C. of one another and still not rising. This indicated no change. The first reading was taken no sooner than three and one-half hours after beginning the test.

The light fixture was tested in a six-sided box having inside dimensions of 12 inches by 12 inches by 12 inches. The test box was made of one-half inch (12.7 mm) plywood or particle board, with one-eighth inch (3.2 mm) thick glass front. All seams were sealed with tape or equivalent to restrict air exchange.

The cabinet light was mounted as close to the sides and top of the test box as the housing or shade provided or the cabinet light permits, and operated until all temperatures stabilized. The mounting means accommodated more than one mounting configuration and the test was conducted in the condition representing the most severe operation.

Two test were conducted and are reported below. In test A, the light fixture was surface mounted. In test B, the light fixture was recessed mounted.

### TABLE 1

**TEST PERIMETERS**

The following reports the test perimeters for the light fixture using a type G4, 20 watt test lamp.

| TEST | VOLTAGE (v) | AMPERAGE (a) | WATTAGE (w) |
|------|-------------|--------------|-------------|
| A. | 123.3 | 0.17 | 20.2 |
| B. | 124.7 | 0.17 | 20.4 |

Table 2 below reports the measured temperature of the thermocouples at various locations relative to the light fixture and the test box.

### TABLE 2

Thermocouple Location And Measured Temperatures

| | TEMPERATURE (° C.) | |
|---|---|---|
| THERMOCOUPLE LOCATION | Test A | Test B |
| Ambient | 24.9 | 25.6 |
| Lampholder (LH) body | 163.9 | 154.2 |
| Lead ¼ from lampholder | 130.9 | 114.2 |
| Between reflector and enclosure | 135.0 | 112.1 |
| Inside plastic enclosure directly above lamp | 106.5 | 84.7 |
| Between LH and enclosure | 126.0 | 109.4 |
| Reflector where wire and can contact | 139.4 | 132.9 |
| On plastic edge of enclosure that can contacts wood | N/A | 77.7 |
| Between lens frame and plastic trim ring | 149.2 | 130.8 |
| Center top of enclosure | 98.5 | 73.2 |
| Cord were enters enclosure | 96.7 | 78.6 |
| Strain relief clamp | 110.6 | 98.3 |
| Mounting surface | 87.2 | N/A |
| Enclosure in contact w/mounting ring | 112.3 | N/A |

In order to pass, no surface in contact with the lighting fixture could experience temperatures in excess of 90° C. Based on the results of this test, the under-cabinet lighting fixture of the present invention passed.

**8**

A second test was conducted to evaluate the dielectric voltage-withstand capacity for the under-cabinet light fixture. In this test, a 40–70 hertz potential of 1200 volts was applied for one minute between the primary wiring, including connected components and accessible dead-metal parts that would likely to become energized, including those parts that were accessible only during re-lamping (and primary wiring and accessible low voltage 42.4 volt peak or less metal part including terminals). The result of this test shows that the lamp withstood the application of the test potential without breakdown for one minute.

It is noted that embodiments of the present invention that lack the central thickened portion 26 of the base, the pad 65 of insulated material, and the air flow channels through and about the reflector, while providing high voltage lighting fixtures, also experienced heat transfer to mounting surfaces which exceeded test limits. However, an embodiment that lacked the pads 65 experienced a temperature slightly over the test standards as shown below in Table 3.

### TABLE 3

Fixture Without Insulative Pad

TEST A

| THERMOCOUPLE LOCATION | TEMPERATURE ° C. |
|---|---|
| Ambient | 25.0 |
| Mounting Surface | 89.0 |
| Mounting Surface | 87.8 |
| Mounting Surface | 90.4 |
| Mounting Surface | 89.1 |

The present invention accordingly provides a high voltage lighting system which controls the communication of heat to mounting surfaces through chimney air flow ventilation from the cap 80, through and about the reflector 60, and exiting from the back adjacent the mounting surface, with the central thickened portion 26, and in some embodiments, insulative pads 65 between the base 22 and the reflector 60. Accordingly, the present invention provides line-voltage lighting fixtures particularly suited for under-cabinet installations. The principles, preferred embodiments, and modes of operation of the present invention have been described in the foregoing specification. The invention is not to be construed as limited to the particular forms disclosed as these are regarded as illustrative rather than restrictive. Moreover, variations and changes may be made by those skilled in the are without departing from the spirit of the invention described in the following claims.

What is claimed is:

1. A high voltage under-cabinet lighting fixture, comprising:

a housing defining an open end that opposes a base having at least a thickened portion, the base defining a plurality of openings in a portion opposing the open end, and a plurality of projections extending from an edge of the housing at the open end;

a reflector defining a dished cavity and seating on the projections to define a gap between the reflector and the housing;

a lamp socket received in the housing with a lamp bulb engaged to the lamp socket, the lamp bulb in alignment with the thickened portion of the base; and

a cap received on the housing, the cap having a plurality of spaced-apart ports,

whereby the lighting fixture defines a pathway for communicating air through the ports, the gap, and the

Exhibit " 3 " - Page 8

US 6,491,413 B1

9                                                          10

openings, for air to flow past the reflector for commu-
nicating heat from the reflector to ambient air.

2. The high voltage under-cabinet light fixture as recited
in claim 1, further comprising an insulating pad received
within the housing in alignment with the thickened portion.

3. The high voltage under-cabinet light fixture as recited
in claim 1, wherein the openings are defined in the base.

4. The high voltage under-cabinet lighting fixture as
recited in claim 3, further comprising an open-ended can for
receiving the housing through one end of the can and
defining a plurality of pins extending outwardly from the can
to define a gap between the can and a surface to which the
can is mounted.

5. The high voltage under-cabinet light fixture as recited
in claim 1, further comprising a recess in a side of the
housing for matingly receiving the socket.

6. The high voltage under-cabinet light fixture as recited
in claim 5, wherein the reflector defines a slot for receiving
the socket by seating the reflector on the open end of the
housing, the socket extending through the slot inwardly of
the cavity defined by the reflector for receiving the lamp
bulb therein.

7. The high voltage under-cabinet light fixture as recited
in claim 1, further comprising an open-ended can for receiv-
ing the housing through one end and defining a plurality of
pins extending outwardly from the can to define a gap
between the can and a surface to which the can is mounted.

8. The high voltage under-cabinet light fixture as recited
in claim 1, wherein the reflector defines a plurality of
openings therein for communicating air from the ports in the
cap to the openings in the base of the housing, for carrying
heat from the reflector out of the fixture.

9. The high voltage under-cabinet as recited in claim 1,
wherein the cap defines a central opening configured to
receive a transparent sheet.

10. The high voltage under-cabinet light fixture as recited
in claim 1, wherein the lamp bulb comprises a bulb portion
of a low voltage shape with a base portion configured for
high voltage.

11. A high voltage under-cabinet lighting fixture, com-
prising:

a housing defining an open end that opposes a base having
at least a thickened portion;

the base defining a plurality of arcuate slots defining
concentric rings spaced radially from a central portion
of the base;

a plurality of projections extending from an edge of the
housing at the open end;

a reflector defining a dished cavity and seating on the
projections to define a gap between the reflector and the
housing;

a lamp socket and a lamp received in the housing with the
lamp in substantial alignment with the thickened por-
tion of the base;

a pad of an insulative material received within the housing
in substantial alignment with the thickened portion of
the base; and

a cap received on the housing and defining a plurality of
spaced-apart ports, the cap receiving a transparent sheet
to provide a cover over the lamp for communicating
light therefrom; and

electrical wires connected to the socket for communicat-
ing current to the lamp for lighting the lamp,

whereby the lighting fixture defines a pathway for com-
municating the air through the ports, the gap, and the
slots, for air to flow past and about the reflector for
communicating heat from the reflector to ambient air.

12. The high voltage under-cabinet light fixture as recited
in claim 11, wherein the lamp comprises a bulb of a low
voltage shape with a base portion configured for high
voltage.

13. A high voltage lighting fixture adapted for mounting
to cabinetry, comprising:

a housing defining an open end that opposes a base that
defines a plurality of openings;

a pad of an insulative material received within the housing
on at least a portion of the base;

a reflector defining a dished cavity and seating on a
plurality of projections extending from an end of the
housing to define a gap between the reflector and the
housing;

a lamp socket received in the housing;

a lamp received in the lamp socket and in substantial
alignment with the pad of the insulative material on the
base of the housing;

a cap received on the housing and defining a plurality of
spaced-apart ports, the cap receiving a light transmis-
sive sheet to provide a cover over the lamp for com-
municating light therefrom; and

electrical wires connected to the socket for communicat-
ing current to the lamp for lighting the lamp,

whereby the lighting fixture defines a pathway for com-
municating the air through the ports, the gap, and the
openings, for air to flow past and about the reflector for
communicating heat from the reflector to ambient air.

14. The high voltage lighting fixture as recited in claim
13, wherein the base further defines a thickened portion in
substantial alignment with the pad.

15. The high voltage lighting fixture as recited in claim
13, further comprising an open-ended can for receiving the
housing through one end of the can; and a plurality of pins
extending from the other end for defining a plurality of
airflow pathways between the light fixture and a surface to
which the can mounts.

16. The high voltage lighting fixture as recited in claim
13, wherein the reflector defines a slot for receiving at least
a portion of the socket within the cavity defined by the
reflector for receiving the lamp therein.

17. The high voltage light fixture as recited in claim 13,
wherein the reflector defines a plurality of openings therein
for communicating air from the ports in the cap to the
openings in the base of the housing, for carrying heat from
the reflector out of the fixture.

18. The high voltage light fixture as recited in claim 13,
wherein the cap defines a central opening and configured to
receive the light transmissive sheet therein.

19. A high voltage under-cabinet lighting fixture, com-
prising:

a housing having an open end that opposes a base with at
least a portion thicker than a wall of the housing and
defining a plurality of openings in the base;

a reflector defining a dished cavity and seating on a
plurality of projections extending from an edge of the
housing to define an air-communicating gap between
the reflector and the housing;

a socket received in the housing with a light bulb engaged
to the socket, the light bulb in alignment with the
thickened portion of the base; and

a cap received on the housing, the cap defining a plurality
of spaced-apart ports,

whereby the lighting fixture defines a pathway for com-
municating air through the ports, the gap, and the

US 6,491,413 B1

**11**

openings, for air to flow past the reflector for communicating heat from the reflector to ambient air.

20. The high voltage under-cabinet light fixture as recited in claim 19, further comprising an insulating pad received within the housing in alignment with the light bulb.

21. The high voltage lighting fixture as recited in claim 19, further comprising an open-ended can for receiving the housing through one end of the can; and a plurality of pins

**12**

extending from the other end for defining a plurality of airflow pathways between the light fixture and a surface to which the can mounts.

22. The high voltage lighting fixture as recited in claim 19, wherein the light bulb comprises a low voltage shape with a high voltage base.

\* \* \* \* \*

# UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.   : 6,491,413 B1                                        Page 1 of 1
DATED        : December 10, 2003
INVENTOR(S)  : Sanford H. Benensohn

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

<u>Title page,</u>
Item [75], change "Sandford H. Benensohn" to -- Sanford H. Benensohn --.

Signed and Sealed this

Seventh Day of October, 2003

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

Exhibit " 9 " - Page 11

33